## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICTOF ILLINOIS
## EASTERN DIVISION

**STEPHEN JENSEN,**

      **Plaintiff,**

**Case No. _____**

**v.**

**JURY TRIAL DEMANDED**

**COUNTY OF COOK--MEDICAL EXAMINER'S OFFICE AND BUREAU OF HUMAN RESOURCES, PONNI ARUNKUMAR, M.D., MARK ERTLER, AND SIMONE MCNEIL,**

      **Defendants.**

## COMPLAINT

Plaintiff, Stephen Jensen ("Jensen" or "Plaintiff"), by his attorneys, The Karmel Law Firm, complains of Defendants County of Cook ("County") and specifically the Cook County Medical Examiner's Office ("CCMEO") and Cook County Bureau of Human Resources ("BHR"), Cook County Chief Medical Examiner Ponni Arunkumar, M.D. ("Dr. Arunkumar"), CCMEO Executive Officer Mark Ertler ("Ertler"), and Deputy Bureau Chief, BHR, Simone McNeil ("McNeil"), in their individual capacities (together, "Defendants"), as follows:

## INTRODUCTION

1.    Jensen brings this lawsuit against Defendants for their unlawful conduct carried out in retaliation for his whistleblowing activities, including unlawful searches of his person, violation of his First Amendment and Due Process rights, retaliatory discipline and ultimately termination of his employment at CCMEO.

2.      Jensen began work in 2016 as a Photo Technician III for CCMEO.  He was skilled at his job, received strong performance reviews, and performed his duties well throughout his employment.

3.      In late 2020, Jensen raised concerns about violations of procurement rules and waste of CCMEO funds by his supervisor and then, in the first half of 2021, of what he reasonably believed were unsafe and non-compliant working conditions for employees of CCMEO. As a result, he suffered escalating retaliation.

4.      After complaining to a safety officer about unsafe warm and humid conditions in the CCMEO autopsy rooms ("post rooms") on June 3, 2021, Jensen was ordered the next day to leave the building and take an unwarranted drug test. Jensen was forbidden from returning to work and his pay stopped without any justification or opportunity to be heard.

5.      There was no reasonable suspicion such as an accident or allegations that Jensen was intoxicated to provide justification for the drug testing of Jensen.

6.      After he was escorted from work and subjected to a drug test, which returned positive for cannabis, CCMEO began to assert that Jensen's position was "safety-sensitive," even though it was not, and that he was therefore not allowed to use cannabis recreationally outside of the workplace even though recreational cannabis use outside of work is allowed under the Cook County Drug and Alcohol Policy ("DAP")[1] for employees in non-safety sensitive positions.

7.      CCMEO required Jensen to complete a drug counseling program and provide a negative drug screen to return to work but, according to the operator of the counseling program, Magellan, McNeil at BHR was difficult to reach and failed to provide clear guidance on the steps Jensen was required to take to return to work.  The standards claimed by McNeil to apply to

_____

[1] *See* https://www.cookcountyil.gov/sites/g/files/ywwepo161/files/service/drug-and-alcohol-policy.pdf at p. 9.

Jensen's return to work shifted over time and she manufactured false reasons to justify how Jensen was treated by Defendants.

8.     Jensen completed the drug counseling program in September 2021 and passed a drug screen that he paid for out of pocket to ensure that he would be cleared to return to work. Jensen then took an additional drug screen required by CCMEO and BHR.

9.     CCMEO then reported to Jensen that this second test returned positive for cannabis—at a standard that applied only for an employee in a safety-sensitive position but below the level that McNeil first stated that Jensen needed to meet—and CCMEO moved to terminate his employment. However, Jensen had not used cannabis for months at this point because he wanted to return to work.

10.     A Pre-Disciplinary hearing was held on October 25, 2021 with Defendants Dr. Arunkumar, McNeil, and Ertler in attendance. However, no discipline was issued within the required timeframe. Nevertheless, Jensen's work email was shut off on November 8, 2021 and Ertler emailed Jensen on his personal email account to terminate his employment on November 18, 2021.

11.     The searches Jensen was subjected to were unconstitutional violations of his rights under the Fourth Amendment and he suffered retaliation for speaking on matters of public concern in violation of his First Amendment rights.  His Due Process rights were violated repeatedly as he was ordered out of work without pay, without any opportunity to be heard, subjected to shifting standards, and ultimately terminated in violation of policy, with his objections and complaints ignored. Defendants retaliated against Jensen in violation of the Illinois Whistleblower statute and intentionally inflicted emotional distress in retaliation for having raised concerns about waste, safety issues, and regarding how he was treated by Defendants in violation of law and policy.

12.     Jensen brings this lawsuit to remedy violations of his rights, to recover lost wages and other compensation, and to be reinstated to his position.

## JURISDICTION

13.     Jurisdiction in this Court is proper under 28 U.S.C. § 1331 and 42 U.S.C. §§ 1983, 1988 for the vindication of Jensen's civil rights.

14.     Jurisdiction over Jensen's state law claims are proper in this Court under 28 U.S.C. § 1367.

## VENUE

15.     Venue is proper in this District under 28 U.S.C. §1391(b) as all the events occurred within the City of Chicago and all parties reside or maintain their place of business in Cook County.

## PARTIES

16.     Jensen is a citizen of the State of Illinois and resides in the City of Chicago. He is a professional photographer and received a bachelor's degree in Photography from Columbia College in Chicago and a Master's in Fine Arts Degree in Photography from the University of Arizona.

17.     CCMEO is an agency of Cook County Government within the Bureau of Administration, under the Office of the President.  CCMEO's primary place of business is located at 2121 W. Harrison Street, Chicago, Illinois 60612.

18.     Dr. Arunkumar is the Cook County Chief Medical Examiner and is, on information and belief, a citizen of the State of Illinois and resides in Cook County.

19.     Ertler is the Executive Officer of CCMEO and is, on information and belief, a citizen of the State of Illinois and resides in Cook County.

20.     McNeil is the Deputy Bureau Chief of the Cook County Bureau of Human Resources and is, on information and belief, a citizen of the State of Illinois and resides in Cook County.

### ADDITIONAL FACTS

21.     Jensen was hired by CCMEO in 2016 as a Photo Technician III. His duties included working in collaboration with medical staff to take photographs during autopsies and working in an office.

22.     Jensen received positive annual reviews and was a valued employee.

23.     Ertler became the CCMEO Executive Officer in 2020.

    a.      Jensen Raises Concerns and Faces Subsequent Retaliation

24.     In early December 2020, Jensen emailed Ertler and Photography Supervisor Katherine Krupela ("Krupela") to raise concerns about wasteful and non-compliant spending by Krupela and Nadine Jakubowski ("Jakubowski"), Ertler's deputy, on approximately $50,000 worth of camera equipment. This equipment was purchased on the grey market and was thus without warranty by the manufacturer, owner's manuals, plugs for U.S. outlets, or needed accessories. It was not suited to the needs of the CCMEO photographers and was thus largely unused, left sitting in its original packaging in a closet. Ertler told Jensen that he was looking into these concerns, but the wasteful misconduct appears to have never been addressed.

25.     Separately, Jensen also met with Dr. Arunkumar and Jakubowski to again raise concerns about this wasteful and improper procurement.

26.     Soon after making these complaints, in connection with being sick following a Covid-19 exposure, Jensen was required to use his existing bank of sick time and vacation time while he was out of work, while other employees were allowed to use a bank of "Covid time" to

cover work absences related to Covid-19.  Ertler and Krupela refused to allow Jensen to also access this benefit, while his CCMEO colleagues could.

27.     In late April 2021, Ertler came to a post room while Jensen and members of the medical staff were discussing the uncomfortably warm and humid conditions in the room, which made it difficult to perform their work safely while wearing Personal Protective Equipment ("PPE"). At that time, Jensen raised concerns with Ertler about the post room conditions and asked him about regulations governing post room temperatures and humidity.

28.     On May 14, 2021, Ertler emailed Jensen about the post room temperatures and asked if Jensen was still requesting a meeting on the subject.  Jensen had not requested a meeting. Before Jensen responded, Ertler approached Jensen in a post room while he was working and, in front of coworkers, stated that he wanted to meet with Jensen in his office.  Jensen found Ertler's approach of him requesting a private meeting to be intimidating and threatening following his prior complaints and disparate treatment with regard to Covid time, and he told Ertler that he preferred for a union representative to be present for a meeting instead of meeting alone.

29.     Rather than schedule a meeting with Jensen and a union representative, on May 20, 2021, Jensen received a written reprimand from Ertler, delivered by Krupela, which falsely claimed that Jensen had refused to meet with Ertler. This was the first discipline that Jensen had received as an employee of CCMEO.

30.     Jensen was upset to receive this unwarranted discipline and went home early for the day. Ertler and Krupela discussed Jensen in the hallway later that day, with Ertler stating something to the effect of "if he wants to leave, adios."

31.     On June 3, 2021, Jensen and members of the medical staff were again complaining amongst themselves about the warm and humid conditions in the post rooms.  Earlier in the day,

they had requested that engineers increase the air conditioning and bring in a dehumidifier. They were told that it was "not convenient right now." Around noon, Safety Officer Steven Smith ("Smith") arrived and Jensen told him that it was an unsafe working environment that they complained about frequently but the administration had failed to take steps to fix. Among other problems, the temperature and humidity caused face shields and protective eyewear to fog up, obscuring visibility and creating risks of accidents, as well as leading to the removal of PPE.

32.     Jensen asked Smith how the post room conditions could be acceptable under OSHA (Occupational Safety and Health Administration), NAME (National Association of Medical Examiners) or ISO (International Standards Organization) standards.

33.     Jensen reasonably believed that the conditions in the CCMEO post rooms violated applicable legal and regulatory standards based on, *inter alia*, his first-hand experience of the warm and humid conditions, observations of colleagues becoming lightheaded or removing PPE that was too hot or became fogged up, and because of the complaints that were raised by physicians, among others, who also believed that the conditions were unacceptable and failed to meet applicable standards.

34.     Jensen finished his workday on June 3rd around 3 pm without incident and without being tested for alcohol or drugs in his system. No one suggested that he was intoxicated.

35.     Jensen was never written up or given a reprimand in connection with his complaint to Smith on June 3.

        b.     <u>Jensen Is Unlawfully Drug Tested and Not Allowed to Return to Work</u>

36.     The next morning, June 4, 2021, Jensen was approached by Smith when he arrived to work and told that Ertler and Jakubowski were waiting to meet with him. Jensen went to Ertler's office and Ertler told him that he needed to go to Employee Health "immediately" for the "safety"

of himself and his coworkers. When Jensen asked for clarification, Ertler refused to provide any other information and told him he needed to leave immediately.

37.     Jensen went to Employee Health as instructed after being escorted out of CCMEO by Smith. As he left, Smith told Jensen to take with him anything he might need from his desk in case he was not allowed to return.

38.     Jensen saw Dr. Vesna Sefer ("Sefer") at Employee Health.  Sefer told Jensen that according to the information she had, Jensen had been sent to Employee Health because of what he said at work the prior day and that CCMEO had ordered a drug test and a fit test. Jensen was shocked by the retaliatory behavior but complied with what he was told was required in order to return to work.

39.     On or about June 11, 2021, before the results of Jensen's drug test had been returned, and still without any write up or hearing, CCMEO stopped paying Jensen.  Jensen's pay was stopped even though Sefer deemed him eligible for sick leave until June 22, 2021.

40.     Jensen visited his personal physician who filled out the form authorizing Jensen's unrestricted return to work on June 18, 2021, as instructed by Sefer.

41.     Jensen saw Sefer again on June 21, 2021, but Sefer said that she could not make a determination on his fitness for duty to allow him to return to work because the drug test result had not come back.

42.     Jensen's drug test result was returned to Employee Health on June 22, 2021.  It was positive for cannabis and, as a result, Sefer deemed him "unfit for duty."

43.     Jensen was unsurprised by the positive test since he had used cannabis recreationally outside of work, which he understood was consistent with the DAP, which provides that "[t]he personal use of cannabis consistent with the CRTA is not prohibited, provided that the

individual's ability to perform job duties satisfactorily is not impaired by such use . . ." Jensen performed his job well, was never intoxicated at work, and was never accused of being intoxicated at work.

44.     Jensen believed his fitness for duty would be cleared up by BHR based on the DAP and that this entire incident was simply further retaliation by Defendants for his protected complaints.

45.     However, a different standard was applied under the DAP for employees in purportedly "safety-sensitive" positions.

46.     Jensen had never been told and never understood that his position was "safety-sensitive" or that he was not allowed to use cannabis outside of work, as Defendants began to claim. This understanding was shared among Jensen's CCMEO coworkers—including those who were directly involved in the actual work of dissecting human remains—and who openly discussed their own use of cannabis outside of work. Indeed, the CCMEO's Safety Standard Operating Procedures and Policy Manual provides only that alcohol and narcotics are prohibited from the workplace and that "[e]mployees are prohibited from being under the influence of alcohol or narcotics while on duty."

47.     Jensen's job description also does not reference his position as safety sensitive nor describe safety sensitive job duties as those are described in the DAP. Indeed, Jensen's primary responsibilities were to take photographs and work in an office. He was not required to operate any CCMEO vehicles or machinery in connection with his position and his position did not qualify as safety-sensitive under applicable legal standards.

48.     However, even if Jensen's position was classified as "safety-sensitive" (which it was not), there were still no grounds under the DAP to target Jensen for a drug test on June 4, 2021.

49.     For example, Jensen was also not subject to a drug test under the DAP's "reasonable suspicion" testing standards, which allow for testing if an employee is believed to be intoxicated, as no one even suggested Jensen was intoxicated or otherwise subject to drug testing.

50.     The DAP also provides that "Drug and alcohol testing based on reasonable suspicion will be administered as soon as possible, preferably within two (2) hours following observations triggering the request to test" and that "Managers/supervisors shall document the circumstances that constituting [sic] reasonable suspicion, and shall include the names of any witness and any information provided by the witness."

51.     Despite Jensen's complaint to Smith occurring around noon on June 3, and his workday continuing for approximately three hours after that, he was not ordered to go to Employee Health to be tested and observed by a physician until the next morning.

52.     When Jensen later complained to the Inspector General ("IG") about what occurred at CCMEO, the IG concluded that "CCMEO staff members all affirmed that no one reported Employee for being under the influence at work." Jensen has seen no documentation reflecting anything constituting reasonable suspicion to drug test him.

53.     In reality, Defendants disregarded the DAP standards and the law to abuse their power to target and retaliate against an employee who had engaged in protected conduct on multiple occasions, in violation of the DAP and Jensen's constitutional rights.

54.     However, despite the faulty predicate for their entire course of conduct, CCMEO and BHR determined to forge ahead with their retaliation against Jensen.

55.     Jensen was told that he needed to enroll in the Magellan Program for substance abuse and attend counseling sessions or he would lose his job.

56.     Jensen did as instructed and began attempting to satisfy Defendants' requirements for his return to work.

57.     The Magellan case worker assigned to his case told Jensen that the official from BHR assigned to his case was uncommunicative, difficult to reach and was not providing a clear answer on what standards applied for his return to work.  The BHR official, Simone McNeil ("McNeil"), failed to answer her phone and had a voicemail box that was not set up.

58.     Meanwhile, CCMEO maintained that the decision on Jensen's return to work was out of its hands and would be handled by McNeil at BHR while McNeil claimed the determination of his fitness for duty belonged with CCMEO.

59.     In addition to being unreachable, McNeil also provided inconsistent information to Magellan and Jensen about what standards applied to his case or what policy he was alleged to have violated.

60.     McNeil initially told Magellan that Jensen was required to provide THC levels below .25ng (nanograms per milliliter) to be cleared to return.

61.     Later, McNeil changed the standard to .15ng and began to assert that Jensen was in a "safety sensitive position."

62.     Jensen emailed McNeil seeking an explanation for his pay being stopped and requesting that she explain the basis for CCMEO and BHR determining that he was unfit for duty.

63.     McNeil's initial response undermined Defendants' assertion that Jensen was in a safety-sensitive position that required him not to use cannabis outside of work: "Good Afternoon,

Stephen, You are correct. You may use a legal substance outside of work, if you so desire. You, however, may not be under the influence of drugs or alcohol at work."

64.     McNeil's response confirmed Jensen's understanding that he was not in a safety-sensitive position as well as reflecting that CCMEO and BHR had no basis for drug testing him, as he was never accused of being intoxicated at work.

65.     While BHR failed to give clear guidance or articulate a consistent position on Jensen returning to his livelihood, Ertler continued to retaliate.

66.     In late June 2021, Jensen submitted a complaint about problems at CCMEO to Illinois OSHA. After initially dismissing the complaint, OSHA reinstated his complaint on or about July 8, 2021.

67.     Shortly thereafter, on or about July 12, 2021, Ertler sent Jensen a Pre-Disciplinary hearing notice, claiming that it had taken Jensen too long to return to work, and claiming that he had engaged in "job abandonment." Defendants advanced this bogus claim despite the drug test results only being returned on June 22, 2021, the haphazard conduct of BHR's McNeil, and the requirement that Jensen complete the Magellan program.

68.     The pre-disciplinary hearing took place on July 16, 2021.

69.     At the hearing, Ertler asserted that he had received three complaints about Jensen on June 3, 2021, which he identified as his justification for sending Jensen to Employee Health for drug testing. This was the first explanation Jensen received for being sent for a drug test. The DAP does not allow for drug testing on the basis of employee complaints. Ertler also did not claim Jensen was intoxicated. Ertler then issued Jensen a second written warning.

c.      Jensen Attempts to Return to Work following the Magellan Program

70.     Jensen completed the required steps in the Magellan program in September and, in order to ensure he would pass a drug test from CCMEO, paid for his own drug test ahead of time. Magellan informed him that he had passed the drug screen with a THC level at .13ng, below the safety sensitive threshold asserted by BHR.  Jensen expected he would finally be allowed to return to work.

71.     Jensen contacted BHR and was informed that he was required to take another drug test, which he did.

72.     Despite having received a clean drug screen beforehand and not having used cannabis for months, Ertler claimed that Jensen's results—sent directly to him and not Jensen—returned with a THC level of .24ng.  While this was below the .25ng standard that McNeil had initially indicated applied for Jensen's return to work, it was above the .15ng standard Defendants later claimed applied.

73.     Defendants then continued their targeting of Jensen. He received a Pre-Disciplinary hearing notice on October 13, 2021.  The hearing was held on October 25, 2021 with Dr. Arunkumar, Ertler, and McNeil all in attendance.

74.     Following the hearing, Ertler emailed the hearing officer with a document that he claimed showed that Jensen's position was safety sensitive, identifying for its basis that Jensen has a driver's license, and no other grounds. This ground is insufficient to designate a position as safety sensitive as a matter of law.

75.     This list appears to reflect an official policy or widespread custom of BHR and CCMEO of over-broadly designating employees as being in safety-sensitive positions under the DAP when the duties of their positions are not actually safety-sensitive, leading to the violation of employee's constitutional rights, including Jensen's.

76. Dr. Arunkumar, Ertler, and McNeil are also employees with final policymaking authority whose actions towards Jensen led to the violations of his constitutional rights.

77. The deadline for the imposition of discipline from the pre-disciplinary hearing was November 1, 2021 under the Cook County Personnel Rules, but CCMEO missed the deadline.

78. Nevertheless, on November 8, 2021, Jensen's CCMEO email was cut off without notice.

79. Then, on November 18, 2021, Jensen received notice of his termination from Ertler at his personal email address.

d. <u>Other Relevant Events at CCMEO</u>

80. In parallel with Jensen attempting to return to work, events occurring at CCMEO showed that Jensen being forced out of work and his pay stopped was disparate and retaliatory treatment and that CCMEO and BHR's claim that Jensen's position was safety sensitive was hollow pretext.

81. For example, also in July 2021, another full time CCMEO photographer, Andrew Thoma ("Thoma"), had a loud and public disagreement with an autopsy technician, Michael Chalmers ("Chalmers"). However, Thoma was not subjected to a drug test.

82. Chalmers, who had a history of inappropriate workplace conduct, was escorted from the building that day but was not subjected to a drug test, and, unlike Jensen, was even interviewed the following day to share his version of events. He was also allowed to return to work a few days later while he awaited the outcome of his Pre-Disciplinary hearing.

83. In other instances, employees who suffered or caused workplace injuries were not ordered to take a drug test.

84.     In addition, CCMEO began to hire unqualified contract workers as photographers in order to replace Jensen.

85.     On information and belief, these individuals were not subjected to any drug or background testing before beginning to work in the same capacity as Jensen, as was required under the DAP for purportedly safety-sensitive positions.

86.     At least one of these individuals discussed their own marijuana use outside of work.

**Count I**
**42 U.S.C. § 1983 – Fourth Amendment Violation**
**All Defendants**

87.     Jensen hereby repeats and realleges each and every allegation in each preceding paragraph as if fully set forth herein.

88.     The Fourth Amendment to the United States Constitution ensures the right to be free from unreasonable searches and seizures and is actionable under 42 U.S.C. § 1983.

89.     Urine tests for drugs like the ones Jensen was subjected to are searches under the Fourth Amendment.

90.     Jensen did not work in a safety-sensitive position because his workplace duties were not fraught with such risks of injury to others that even a momentary lapse of attention could have disastrous consequences.

91.     There was no reasonable suspicion to search Jensen.

92.     Jensen was subjected to searches without any individualized suspicion or wrongdoing on his part, in violation of the DAP and without any specialized governmental needs to justify the search.

93.     As a result of Defendants' unconstitutional searches of his person, Jensen has suffered various damages including but not limited to lost wages and benefits.

**Count II**
**42 U.S.C. § 1983 – First Amendment Retaliation**
**Defendants Cook County, Dr. Arunkumar and Ertler**

94.    Jensen hereby repeats and realleges each and every allegation in each preceding paragraph as if fully set forth herein.

95.    Violations of Jensen's rights under the First Amendment are actionable under 42 U.S.C. § 1983.

96.    Jensen's workplace speech about health and safety issues and in defense of the public fisc by raising concerns about improper and wasteful spending was constitutionally protected as these are matters of public concern and relate to the proper and safe functioning of CCMEO, an important government agency.

97.    Jensen's constitutionally-protected speech was a substantial or motivating factor in the discipline he was issued, his loss of earnings, the unlawful search to which he was subjected, and ultimately his termination.

98.    The retaliation against Jensen for his speech had a chilling effect on speech regarding these and other matters of public concern.

99.    As a result of Defendants' retaliation, Jensen has suffered various damages including but not limited to lost wages and benefits.

**Count III**
**42 U.S.C. § 1983 – Procedural Due Process**
**All Defendants**

100.    Jensen hereby repeats and realleges each and every allegation in each preceding paragraph as if fully set forth herein.

101.     The Fourteenth Amendment to the United States Constitution prohibits deprivations of an individual's life, liberty, or property without due process of law.

102.     The Fourteenth Amendment is enforceable under 42 U.S.C. § 1983.

103.     Jensen had a property interest in his continued employment with CCMEO, his wages, benefits and pension.

104.     Pursuant to the Cook County Code of Ordinances Section 38-115, employees of the CCMEO are Cook County employees and subject to the rules and regulations established by the Board of Commissioners.  Under the Cook County Personnel Rules, employee discipline must follow a just cause standard.

105.     Jensen paid dues to SEIU Local Union No. 73 which also required a just cause standard for discipline through its contract with Cook County.

106.     Jensen had requested fair share status with Local 73.

107.     Jensen's due process rights were violated when his pay and benefits were stopped without any discipline being issued or any opportunity for a pre- or post-deprivation hearing and despite Jensen being eligible for sick time, per Sefer, to cover the time that he was out of work following the drug test and before the result was returned.

108.     Defendants also violated Jensen's due process rights by, *inter alia*, issuing him discipline for his protected speech and whistleblowing activities, failing to respond to his repeated requests for an answer regarding the legal and policy grounds for how he was treated, and terminating his employment in violation of Cook County Personnel Rules and Local 73's collective bargaining agreement.

109.    During the summer of 2021 and subsequent to his discharge, Jensen requested on multiple occasions that Local 73 grieve his discipline and termination.  Local 73 failed to file a grievance.

110.    Jensen's similarly-situated colleague, who had not elected fair share status with Local 73, had one or more grievances filed on his behalf.  Jensen was effectively left without representation.

111.    Separately, Jensen complained repeatedly to the Defendants directly about the lawless process of drug testing, discipline, and his ultimate termination, to which Defendants failed to ever adequately respond.

112.    As a result, Jensen has suffered various damages including but not limited to lost wages and benefits.

### Count IV
### Retaliation in Violation of Illinois Whistleblower Act—740 ILCS 174/1 *et seq.*
### All Defendants

113.    Jensen hereby repeats and realleges each and every allegation in each preceding paragraph as if fully set forth herein.

114.    Defendants are Employers covered by the Illinois Whistleblower Act and Jensen is an Employee within the meaning of the Illinois Whistleblower Act.

115.    Jensen disclosed information to CCMEO and other government agencies that he reasonably believed constituted a violation of state or federal law, rule, or regulation.

116.    Jensen also disclosed information about public corruption or wrongdoing.

117.    Because of Jensen's complaints, he suffered retaliation and damages in the form of, *inter alia*, an unconstitutional search, lost wages and benefits, and ultimately the termination of his employment.

## Count V
## Common Law Retaliatory Discharge
## All Defendants

118.     Jensen hereby repeats and realleges each and every allegation in each preceding paragraph as if fully set forth herein.

119.     Defendants discharged Jensen because his complaints about unsafe working conditions under legal and professional standards applicable to medical examiner's offices and the misuse of CCMEO funds under Cook County Procurement rules.

120.     Jensen's discharge on these grounds violates clear mandates of public policy relating to the provision of safe working conditions to employees and the proper stewardship of taxpayer funds.

121.     As a result, Jensen has suffered various damages including but not limited to lost wages and benefits.

## Count VI
## Intentional Infliction of Emotional Distress
## Defendants Arunkumar, Ertler and McNeil

122.     Jensen hereby repeats and realleges each and every allegation in each preceding paragraph as if fully set forth herein.

123.     Defendants Arunkumar, Ertler, and McNeil engaged in extreme and outrageous conduct by subjecting Jensen to unconstitutional drug testing in violation of the DAP, targeting Jensen for retaliation on an ongoing basis following his protected conduct, discontinuing Jensen's pay and benefits, issuing Jensen unwarranted and retaliatory discipline, and ultimately terminating Jensen on unlawful grounds.

124.     Defendants Arunkumar, Ertler, and McNeil either intended to inflict severe emotional distress on Jensen, or knew there was a high probability their statements would cause Jensen severe emotional distress, and their conduct targeting Jensen was willful and wanton.

125.     As a result of Ertler's conduct, Jensen has suffered severe and ongoing emotional distress.

**Count VII**
**Illinois Minimum Wage Law—820 ILCS 105/1 *et seq.***
**Defendants CCMEO, Arunkumar, and Ertler**

126.     Jensen hereby repeats and realleges each and every allegation in each preceding paragraph as if fully set forth herein.

127.     CCMEO failed to pay Jensen for all of his time worked or overtime compensation when he worked in excess of forty hours per week.

128.     In order to meet the requirements of the medical staff members with whom he worked, Jensen was required to arrive at work between 6:15 and 6:45 a.m. on most days.  He would clock in upon his arrival.

129.     Rather than pay Jensen for this required working time, CCMEO manually adjusted his time records so that he was only paid for work beginning at 7:00 a.m.

130.     Jensen was also regularly required to work through lunch, which constituted additional working time as well as overtime for which he was not paid.

131.     As a result of Defendants' conduct, Jensen was not paid for all of his time worked and did not receive overtime compensation to which he was entitled.

## <u>JURY TRIAL DEMANDED ON ALL ISSUES</u>

132.     The Plaintiff respectfully requests a jury trial on all issues so triable.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff, Stephen Jensen respectfully requests relief against Defendants, Cook County, Dr. Ponni Arunkumar, Mark Ertler, and Simone McNeil as follows:

    a.   Declaratory, equitable and injunctive relief, including but not limited to reinstatement and backpay;

    b.   Compensatory damages, including but not limited to lost wages and earning opportunities, interest, front pay, emotional distress damages;

    c.   Consequential damages;

    d.   Punitive damages;

    e.   Attorneys' fees and costs;

    f.   All other relief this Court deems just.

Respectfully submitted,

/s/ Jonathan D. Karmel
Attorney for Stephen Jensen

/s/ Joseph Torres
Attorneys for Stephen Jensen

Karmel Law Firm
20 S. Clark Street
Suite 1720
Chicago, Illinois 60603
Phone:  312-641-2910
Fax:  312-641-0781
jon@karmellawfirm.com
joe@karmellawfirm.com