## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| STEPHEN JENSEN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 22-cv-5571 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| COUNTY OF COOK, PONNI | ) | |
| ARUNKAMAR, M.D., MARK ERTLER, | ) | |
| and SIMONE MCNEIL, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Stephen Jensen lost his job as a photographer for the Cook County Medical Examiner's Office. Jensen believes that the County let him go because he started expressing financial and safety concerns. He complained about wasteful spending for camera equipment, and spoke up about the hot and humid conditions inside the examination rooms for autopsies. But the County purported to fire Jensen because he failed two drug tests for cannabis. After the second failed drug test, the County showed him the door.

Jensen filed a seven-count complaint against the County about the loss of his job. Jensen also sued a few high-ranking officials, including the Chief Medical Examiner (Dr. Ponni Arunkumar), the Executive Officer (Mark Ertler), and the Cook County Bureau of Human Resources Deputy Bureau Chief (Simone McNeil). He brought an assortment of constitutional claims, and claims under state law.

The four Defendants jointly moved to dismiss. For the reasons explained below, Defendants' motion to dismiss is granted in part and denied in part.

## Background

At the motion-to-dismiss stage, the Court must accept as true the complaint's well-pleaded allegations. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

### *The Job*

Stephen Jensen is a professional photographer. He majored in photography as an undergraduate, and he has a Master's Degree in Fine Arts in photography, too. *See* Am. Cplt., at ¶ 16 (Dckt. No. 6).

In 2016, Jensen began working as a Photo Technician III at the Cook County Medical Examiner's Office. *Id.* at ¶ 2. He took photos during autopsies. *Id.* at ¶ 21. Jensen did not perform the autopsies themselves. That's the job of the medical staff. But Jensen helped make a record of the examinations by taking photos.

Jensen received positive performance reviews. *Id.* at ¶ 23. But after a few years, things started going south.

### *The Problem with the Equipment*

His workplace woes began in December 2020. Jensen became concerned about wasteful and non-compliant spending by two higher-ups at the Medical Examiner's Office, Katherine Krupela and Nadine Jakubowski. *Id.* at ¶ 24.

Krupela and Jakubowski had spent about $50,000 on camera equipment on the "gray market." *Id.* The equipment left something to be desired. It came without a warranty, owner's manuals, plugs for U.S. outlets, and necessary accessories. *Id.* Most of the equipment wasn't

suited to the needs of the job. *Id.* So, it sat in a closet, collecting dust in its original packaging. *Id.*

Jensen raised concerns about the wasteful spending. He sent an email to Krupela and to Mark Ertler, the Executive Officer of the Medical Examiner's Office. *Id.* at ¶¶ 23–24. Ertler replied that he would look into it. *Id.* at ¶ 24. But in Jensen's view, nothing was done. *Id.*

Separately, Jensen also raised concerns about the equipment during a meeting with Jakubowski and Dr. Ponni Arunkamar, the Cook County Chief Medical Examiner. *Id.* at ¶ 25. But the complaint at hand (meaning the pleading before this Court) offers no details.

Soon later, Jensen became sick after a COVID-19 exposure.[1] *Id.* at ¶ 26. Other employees used a bank of "COVID time" to cover COVID-related work absences. But Ertler and Krupela did not let Jensen access this benefit. *Id.* Instead, Jensen had to use his existing bank of sick time and vacation time to cover his absences. *Id.*

### *The Problem with the Examination Rooms*

In late April 2021, another issue came to the surface. It started with a conversation between Jensen and his co-workers in an autopsy room.

Jensen and some medical staffers started talking about the uncomfortably warm and humid conditions of the room. And then they started talking about the conditions in the autopsy rooms generally. The examination rooms were warm and humid, which doesn't seem ideal when you're performing an autopsy.

The temperature and the humidity made it difficult to work safely while wearing protective equipment. *Id.* at ¶ 27. The heat and humidity made face shields and protective

---

[1] The complaint stops short of saying that Jensen had COVID-19. Instead, it says that he became sick after a COVID-19 exposure. So, it is not crystal clear whether Jensen had the coronavirus, or something else.

eyewear become fogged up, leading to obscured visibility and increased risk of accidents. *Id.* at ¶ 31. Jensen had observed colleagues taking off fogged-up protective equipment – or becoming lightheaded in the high heat. *Id.* at ¶ 33.

As they discussed the hot and humid conditions, Ertler (again, the Executive Officer) walked into the room. *Id.* at ¶ 27. Jensen shared his concerns about the balmy rooms with Ertler. And he asked about "regulations" for temperature and humidity in autopsy rooms. *Id.*

A few weeks later, on May 14, 2021, Ertler emailed Jensen and asked if Jensen still wanted a meeting about the room conditions. *Id.* at ¶ 28. Jensen believed that that message was odd, because Jensen had never requested a meeting. *Id.*

Before Jensen replied to the email, Ertler came into an autopsy room while Jensen was working. *Id.* In front of his colleagues, Ertler asked Jensen to meet in Ertler's office. *Id.*

Jensen was still smarting after the incident about the bank for Covid time, and he found the request "intimidating and threatening." *Id.* So, Jensen told Ertler that he did not want a one-on-one meeting. *Id.* Instead, he preferred that they meet with a union representative. *Id.*

Ertler did not schedule a meeting with Jensen and a union rep. *Id.* at ¶ 29. Instead, Ertler sent Jensen a written reprimand on May 20, 2021. *Id.* The reprimand falsely claimed that Jensen had refused a meeting. *Id.*

By that point, Jensen had worked at the Medical Examiner's Office for five years, and he had never received discipline. *Id.* at ¶¶ 29–30. So, Jensen felt upset about the "unwarranted discipline." *Id.* at ¶ 30. He decided to go home for the day to lick his wounds. *Id.*

Back at the office, Ertler was unbothered. *Id.* He told Krupela: "if he [Jensen] wants to leave, adios." *Id.*

On June 3, 2021, Jensen and other members of the medical staff were chatting again about the warm and humid conditions in the autopsy rooms. *Id.* at ¶ 31. Earlier that day, the staff had asked the engineers to turn up the air conditioning and bring in a dehumidifier. *Id.* But nothing was done. *Id.*

Around noon, Jensen told Safety Officer Steven Smith that the working environment was unsafe. *Id.* The administration had done nothing to fix the room conditions, despite frequent staff complaints. *Id.* Jensen shared that "the temperature and humidity caused face shields and protective eyewear to fog up, obscuring visibility and creating risks of accidents, as well as leading to the removal of" protective equipment. *Id.*

Worse yet, Jensen believed that the conditions violated legal and regulatory standards, including standards set by the Occupational Safety and Health Administration (*i.e.*, OSHA), the National Association of Medical Examiners, and the International Standards Organization. *Id.* at ¶¶ 32–33. Physicians had raised similar concerns, too. *Id.* at ¶ 33. So, Jensen asked Smith how the conditions in the autopsy rooms could satisfy industry standards. *Id.* at ¶ 32.

The complaint does not reveal how Smith responded. Even so, the key point is that Jensen did not receive a reprimand then and there. *Id.* at ¶ 35. He finished his workday on June 3 at about 3:00 p.m., without incident. *Id.* at ¶ 34. No one suggested that he seemed intoxicated, and he was not tested for alcohol or drugs. *Id.*

### *The First Drug Test*

The next day, things took a turn for the worse. When Jensen arrived at work on June 4, 2021, Smith informed him that Ertler and Jakubowski were waiting to meet with him. *Id.* at ¶ 36.

Jensen went to Ertler's office, and Ertler told him to go to Employee Health "immediately" for the "safety" of himself and his co-workers. *Id.* At that point, Smith escorted Jensen out of the Medical Examiner's Office. *Id.* at ¶ 37. Smith told Jensen to grab anything he needed from his desk, in case he was not allowed to return to work. *Id.*

At Employee Health, Jensen met with Dr. Vesna Sefer. *Id.* at ¶ 38. Dr. Sefer told Jensen that he was sent to Employee Health because "of what he said at work the prior day." *Id.* She told Jensen that the Medical Examiner's Office had ordered a drug test and a fit test. *Id.*

Jensen was "shocked by the retaliatory behavior." *Id.* But he complied so that he could get back to work. *Id.*

The complaint does not pin down when, exactly, Jensen took the drug test. By the look of things, it appears that Jensen took a drug test at some point on June 4.

It took a few weeks for the test results to come back. In the meantime, Jensen stopped getting paid. The Medical Examiner's Office stopped paying Jensen on June 11, 2021, "before the results of Jensen's drug test had been returned." *Id.* at ¶ 39. He stopped receiving pay, "without any write up or hearing," even though he was eligible for sick leave until June 22, 2021. *Id.*; *see also id.* at ¶ 4.

Jensen's personal physician authorized his return to work without restriction on June 18, 2021. *Id.* at ¶ 40. But he didn't return to work right away. On June 21, 2021, Jensen met again with Dr. Sefer of Employee Health. Dr. Sefer said that she needed the test results before assessing his fitness for duty. *Id.* at ¶ 41.

Jensen's test results came back on June 22, 2021. *Id.* at ¶ 42. It lit up green for cannabis. *Id.* So, Dr. Sefer deemed him "unfit for duty." *Id.*

Jensen was a recreational cannabis user, so the positive test results did not surprise him. *Id.* at ¶ 43. But he was never intoxicated at work. *Id.* And no one had ever accused him of being intoxicated at work, either. *Id.*

And in any event, Jensen didn't think that his recreational use of marijuana ran afoul of Cook County's Drug and Alcohol Policy. *Id.* The policy did not prohibit marijuana use, as long as the employees could do their jobs. "The personal use of cannabis consistent with the CRTA [Cannabis Regulation and Tax Act] is not prohibited, provided that the individual's ability to perform job duties satisfactorily is not impaired by such use . . . ." *Id.*

However, the policy provided a different standard for employees in so-called "safety-sensitive" positions. *Id.* at ¶ 45. The policy did not flatly prohibit employees from using marijuana if their jobs involved safety. But the permissible amount of marijuana was lower.

Up to that point, no one had told Jensen that his job was safety-sensitive, and he didn't view the position as safety-sensitive, either. *Id.* at ¶ 46. His job description did not refer to his position as "safety-sensitive" or describe any safety-sensitive job duties. *Id.* at ¶ 47.

After all, Jensen took photos and worked in an office. *Id.* He did not operate vehicles or machinery. *Id.* So, he believed that he was allowed to use cannabis recreationally. *Id.* at ¶ 46.

Remember, Jensen took pictures during autopsies. If you're a little high while taking pictures during an autopsy, things can go only so wrong. And the ceiling isn't very high.

Jensen's colleagues – including those who handled human remains during the autopsies, rather than simply taking photos – appeared to have the same understanding. *Id.* Many of them openly discussed their personal cannabis use. *Id.* The Medical Examiner's Office's manual did not seem to bar all cannabis use, either. The manual provided only that "[e]mployees are prohibited from being under the influence of alcohol or narcotics while on duty." *Id.*

The Cook County Drug and Alcohol Policy addressed when employees could face drug tests for jobs that were not "safety-sensitive." The policy imposed a "reasonable suspicion" standard, meaning that Cook County needed to have a "reasonable suspicion" that the employees was intoxicated at work. *Id.* at ¶ 49.

The drug test was time-sensitive, too. The policy provided that testing based on reasonable suspicion "will be administered as soon as possible, preferably within two (2) hours following observations triggering the request to test." *Id.* at ¶ 50.

Jensen complained to the Inspector General about what happened at the Medical Examiner's Office. *Id.* at ¶ 52. The Inspector General reported: "CCMEO staff members all affirmed that no one reported Employee for being under the influence at work." *Id.*

### *The Substance Abuse Program*

Jensen believed that the drug testing was retaliation for his complaints about the camera equipment and the hot, humid conditions in the examination rooms. *Id.* at ¶ 44. But Jensen wanted to keep his job.

The Medical Examiner's Office told Jensen that he needed to complete the Magellan substance abuse program and attend counseling sessions, or he would lose his job. *Id.* at ¶ 55. So, Jensen embarked on the return-to-work requirements. *Id.* at ¶ 56.

Completing that process was easier said than done. Jensen found himself entangled in a rat's nest of noncommunication, inconsistent information, and finger-pointing.

Simone McNeil, the Cook County Bureau of Human Resources official assigned to his case, was difficult to reach. *Id.* at ¶ 57. She failed to provide clear guidance about what Jensen needed to do to get back to work. *Id.* at ¶ 7.

The Magellan case worker told Jensen about the problems with McNeil. *Id.* at ¶ 57. The worker told Jensen that McNeil was uncommunicative and hard to reach. *Id.* McNeil did not answer her phone and hadn't set up a voicemail box. *Id.* And McNeil wasn't giving Magellan a clear answer about the standards that Jensen needed to meet. *Id.*

McNeil moved the goalposts, too. "The standards claimed by McNeil to apply to Jensen's return to work shifted over time and she manufactured false reasons to justify how Jensen was treated by Defendants." *Id.* at ¶ 7. That is, McNeil "provided inconsistent information to Magellan and Jensen about what standards applied to his case or what policy he was alleged to have violated." *Id.* at ¶ 59.

At first, McNeil told Magellan that Jensen could return to work after reporting THC levels below .25 ng (nanograms per milliliter). *Id.* at ¶ 60. But then, McNeil raised the bar by lowering the standard for a passing grade. McNeil said that test results needed to be below .15 ng (not .25 ng), and began asserting that Jensen was in a "safety sensitive position." *Id.* at ¶ 61.

McNeil initially told Jensen that he could use cannabis recreationally. *Id.* at ¶ 63. She emailed Jensen stating that he simply could not be impaired at work. "You may use a legal substance outside of work, if you so desire. You, however, may not be under the influence of drugs or alcohol at work." *Id.*

Meanwhile, Jensen couldn't get a straight answer about who would decide whether he could come back to work. McNeil claimed that it was up to the Medical Examiner's Office, and the Medical Examiner's Office claimed that it was up to McNeil. *Id.* at ¶ 58. When it came to deciding Jensen's fitness for duty, no one seemed to have their hand on the wheel. *Id.*

In late June 2021 – while he was working through the return-to-work requirements – Jensen submitted a complaint about the Medical Examiner's Office to Illinois OSHA. *Id.* at ¶ 66. The complaint was initially dismissed. *Id.* It was reinstated on July 8, 2021. *Id.*

A few days later, on July 12, 2021, Ertler sent Jensen a pre-disciplinary hearing notice. *Id.* at ¶ 67. The letter claimed that Jensen had taken too long to return to work and thus had engaged in "job abandonment." *Id.*

Jensen's pre-disciplinary hearing was held on July 16, 2021. *Id.* at ¶ 68. At the hearing, Ertler claimed that he had received three complaints about Jensen on June 3, 2021, which had prompted him to send Jensen for drug testing on June 4, 2021. *Id.* at ¶ 69. Ertler then issued Jensen a second written warning. *Id.*

### The Next Drug Tests

Two months later, in September 2021, Jensen completed the required steps for the Magellan program. *Id.* at ¶¶ 8, 70. Jensen took another drug test, and he paid for it out of his own pocket. *Id.*

Once again, Jensen tested positive for cannabis. *Id.* at ¶¶ 9, 70. But the results weren't off the charts. Magellan informed Jensen that he passed the drug screen with a THC level of .13 ng. *Id.* at ¶ 70.

That amount (.13 ng) was just below the threshold of .15 ng for safety-related jobs. *Id.* So Jensen expected that the Medical Examiner's Office would allow him to return to work. *Id.* His test results were below the threshold for safety-related jobs. And in any event, Jensen did not believe that his job was safety-related.

10

Jensen contacted the Bureau of Human Resources, which required him to take yet another drug test. *Id.* at ¶ 71. So Jensen took a third drug test.[2]

Jensen had gone cannabis-free for months. Even so, Jensen tested positive yet again. And worse yet, the results were higher than what Jensen had expected. His results went *up*. That is, his results from the test by Employee Health were higher than the results from the test that Jensen had paid on his own. *Id.* at ¶ 72.

The test results went directly to Ertler, not to Jensen. And Ertler then shared the bad news. The test showed a THC level of .24 ng. *Id.*

Depending on the yardstick, a test result of .24 ng is either a passing grade or a failing grade. Jensen alleges that a test result of .24 ng satisfied the .25 ng standard that McNeil initially indicated. Presumably that's the standard for jobs that do not involve safety concerns. But a test result of .24 ng exceeded the .15 ng mark that applies to safety-sensitive jobs. *Id.*

### *The Termination*

After getting the test results, the Medical Examiner's Office pressed forward with its efforts to terminate Jensen. *Id.* at ¶¶ 9, 73.

Jensen received another pre-disciplinary hearing notice on October 13, 2021. *Id.* at ¶ 73. The hearing took place on October 25, 2021. *Id.* at ¶¶ 10, 73. Ertler and McNeil attended the hearing. *Id.* Dr. Arunkumar, the Cook County Chief Medical Examiner, was also present. *Id.*

---

[2] As this Court reads the complaint, Jensen took three drug tests. He took the first test on or about June 4, 2021, when he went to Employee Health for the first time. *See* Cplt., at ¶ 4 (Dckt. No. 1) (stating that Jensen was "ordered" to "take an unwarranted drug test"). He took a second one (which he paid for, out of his own pocket) in September 2021. *Id.* at ¶ 8. He took a third one a short time later. *Id.* ("Jensen completed the drug counseling program in September 2021 and *passed a drug screen* that he paid for out of pocket to ensure that he would be cleared to return to work. Jensen then took an *additional* drug screen required by CCMEO and BHR [*i.e.*, the Bureau of Human Resources].") (emphasis added). At one point, the complaint refers to the third drug test as the "second" drug test. *Id.* at ¶ 9. The Court assumes that the complaint means that it was the second test administered by Magellan and paid for by the Medical Examiner's Office (but the third test overall).

After the hearing, Ertler emailed a document to the hearing officer showing that Jensen's position was safety-sensitive.  *Id.* at ¶ 74.  The document identified a single basis for the notion that Jensen's job raised safety concerns:  he had a driver's license.  *Id.*

Under the Cook County Personnel Rules, the Medical Examiner's Office had until November 1, 2021 to impose discipline stemming from the pre-disciplinary hearing.  *Id.* at ¶ 77. The Office missed the deadline.  *Id.*

Even so, the Medical Examiner's Office cut off Jensen's access to his work email on November 8, 2021.  *Id.* at ¶ 78.  And a week and a half later, on November 18, 2021, Ertler sent Jensen a notice of termination.  *Id.* at ¶¶ 10, 79.

### The Lawsuit

The termination led to the filing of this lawsuit.  In October 2022, Jensen filed a complaint against Cook County, Dr. Arunkumar, Ertler, and McNeil.  The complaint includes seven counts.  The first three counts are federal claims, and the other four counts are state-law claims.

Count I is a Fourth Amendment claim about the obligation to take a drug test.  *Id.* at ¶¶ 87–93.  Jensen brings that claim against all Defendants.

Count II is a First Amendment retaliation claim against Cook County, Dr. Arunkumar, and Ertler.  *Id.* at ¶¶ 94–99.

Count III is a due process claim under the Fourteenth Amendment against all Defendants. *Id.* at ¶¶ 100–12.  Specifically, Jensen claims that his pay and benefits were stopped before he was disciplined, and without the opportunity for a pre- or post-deprivation hearing.  *Id.* at ¶ 107. Jensen also argues that Defendants violated his due process rights when they failed to respond to

his requests for information on the legal and policy grounds for Defendants' actions. *Id.* at

¶ 108.

Count IV is a retaliation claim against all Defendants under the Illinois Whistleblower

Act, 740 ILCS 141/1 *et seq. Id.* at ¶¶ 113–17.

Count V is a common law retaliatory discharge claim against all Defendants. *Id.* at

¶¶ 118–21.

Count VI is a claim for intentional infliction of emotional distress against Dr.

Arunkumar, Ertler, and McNeil. *Id.* at ¶¶ 122–25.

Finally, Count VII is a claim under the Illinois Minimum Wage Law, 820 ILCS 105/1 *et

seq.* Jensen brings that claim against Cook County, Dr. Arunkumar, and Ertler.[3] *Id.* at ¶¶ 126–

31.

Defendants, in turn, moved to dismiss the complaint. *See* Defs.' Mtn. to Dismiss Pl.'s

Am. Cplt. (Dckt. No. 29).

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not

its merits. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir.

1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-

pleaded facts in the complaint and draws all reasonable inferences from those facts in the

plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive

a Rule 12(b)(6) motion, the complaint must provide the defendant with fair notice of the basis for

---

[3] The complaint states that Jensen brings Count VII against Defendants "CCMEO, Arunkumar, and
Ertler." *See* Am. Cplt., at 20 (Dckt. No. 6). However, Cook County is the named Defendant in this suit –
*not* the Medical Examiner's Office. In the motion to dismiss, Defendants proceeded as if Jensen alleged
Count VII against the County, Dr. Arunkumar, and Ertler. *See* Defs.' Mtn. to Dismiss, at 11 (Dckt.
No. 29). The Court will do the same, but simply points out this discrepancy to dispel any confusion.

the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## Analysis

### I.      Fourth Amendment (Count I)

The first claim alleges that the drug tests constituted an unreasonable search in violation of the Fourth Amendment. *See* Am. Cplt., at ¶¶ 87–93 (Dckt. No. 6). Jensen brings Count I against all Defendants.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *See* U.S. Const. Amend. IV. The Supreme Court has held that state-compelled drug testing counts as a search under the Fourth Amendment. *See Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995).

Defendants argue that the search did not violate the Fourth Amendment because the Cannabis Regulation and Tax Act allows employers to discipline or terminate employees based on drug use. *See* Defs.' Mtn. to Dismiss Pl.'s Am. Cplt., at 8 (Dckt. No. 29). They also contend that the complaint has not done enough to allege a Fourth Amendment claim against the County itself within the meaning of *Monell*. *Id.* at 7.

The Court will consider each argument in turn.

### A.      Cannabis Regulation and Tax Act

Defendants begin with an argument that suffers from underdevelopment. They offer a conclusory argument in a three-sentence paragraph. Two of the three sentences simply quote the statute.

14

By the look of things, Defendants seem to argue that the drug testing did not violate the Fourth Amendment because the state statute permitted the drug testing. They point out that the Cannabis Regulation and Tax Act allows the state to discipline employees based on drug use. *See* Defs.' Mtn. to Dismiss Pl.'s Am. Cplt., at 8 (Dckt. No. 29).

"As a general rule, drug testing must be based upon individualized suspicion or wrongdoing to be considered reasonable" under the Fourth Amendment. *Krieg v. Seybold*, 481 F.3d 512, 517 (7th Cir. 2007) (citing *Chandler v. Miller*, 520 U.S. 305, 313 (1997)).

The Fourth Amendment permits random drug testing when the government has a special need – such as when an employee holds a "safety-sensitive" position. *Id.* (citing *Skinner v. Ry. Lab. Executives' Ass'n*, 489 U.S. 602, 630 (1989)). But even when a special need exists, courts should "balance the individual's privacy expectations against the government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." *Nat'l Treasury Employees Union v. Von Raab,* 489 U.S. 656, 665 (1989); *see also Krieg*, 481 F.3d at 517.

The Seventh Circuit considers four factors when balancing the individual's privacy expectations against the government's interest: "1) the nature of the privacy interest upon which the search intrudes, 2) the character of the intrusion on the individuals' privacy interest, 3) the nature and immediacy of the governmental concern at issue, and 4) the efficacy of the particular means used to address the problem." *See Krieg*, 481 F.3d at 518 (citing *Joy v. Penn-Harris-Madison Sch. Corp.*, 212 F.3d 1052, 1059 (7th Cir. 2000)).

Here, Defendants seemingly argue that a drug test that complies with state law necessarily complies with the Fourth Amendment, too. If that's the argument, it seems to offer an upside-down view of the Supremacy Clause. Under the Supremacy Clause, federal law is top

15

dog when state and federal law conflict. "[A]ny state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *See Felder v. Casey*, 487 U.S. 131, 138 (1988).

In any event, the argument is skeletal to the point of starvation, and the Court will not pick through the bones. *See Massuda v. Panda Exp., Inc.*, 759 F.3d 779, 783 (7th Cir. 2014) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (quoting *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991)); *Hernandez v. Cook Cnty. Sheriff's Off.*, 634 F.3d 906, 913 (7th Cir. 2011) ("It is well established in our precedents that 'skeletal' arguments may be properly treated as waived . . . .").

### B. *Monell* Liability

Next, the Court must determine whether Jensen's Fourth Amendment claim survives against Cook County.

Under section 1983, a municipality can be held liable for its own violations of constitutional law, but it cannot be held vicariously liable for the actions of its employees. *See First Midwest Bank ex rel. LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021); *see also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978). "Specifically, the plaintiff must prove that the constitutional violation was caused by a governmental 'policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.'" *See First Midwest Bank*, 988 F.3d at 986 (quoting *Monell*, 436 U.S. at 694).

The Seventh Circuit's "case law establishes that unconstitutional policies or customs take three forms: (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice, that, although unauthorized, is so permanent and well-settled that it

constitutes a 'custom or usage' with the force of law; or (3) an allegation that a person with final policymaking authority caused the injury." *Chortek v. City of Milwaukee*, 356 F.3d 740, 748 (7th Cir. 2004); *see also Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019).

Jensen contends that he has adequately alleged both a widespread custom and that someone with final policymaking authority caused his injury. *See* Pl.'s Resp. to Defs.' Mtn. to Dismiss, at 4–5 (Dckt. No. 33). The Court will consider each argument in turn.

No bright-line rule defines a widespread custom or practice, but "it is clear that a single incident – or even three incidents – do not suffice." *See Wilson v. Cook County*, 742 F.3d 775, 780 (7th Cir. 2014). The other incidents must be sufficiently similar to support an inference of a broader pattern. *See, e.g.*, *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 657 (7th Cir. 2021) (explaining that "the comparator[s] need not be perfect" but the "similarities" must be sufficient to "show a widespread practice"); *Tillman v. Burge*, 813 F. Supp. 2d 946, 978 (N.D. Ill. 2011).

Jensen alleges that the Medical Examiner's Office had a widespread custom of "overly-broadly designating employees as being in safety-sensitive positions under the [Drug and Alcohol Policy] when the duties of their position are not actually safety-sensitive, leading to the violation of the employee's constitutional rights[.]" *See* Am. Cplt., at ¶ 75 (Dckt. No. 6). Jensen bases this allegation on a "list" of positions that were incorrectly designated as safety-sensitive. *Id.* at ¶¶ 74–75.

*Monell* claims are not subject to a heightened pleading standard. *See Est. of Sims ex rel. Sims v. County of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007). Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2).

Still, conclusory allegations do not suffice under Rule 8. *See Brooks v. Ross*, 578 F.3d 574, 582 (7th Cir. 2009); *see also Porter v. Bd. of Educ. of City of Chicago*, 2018 WL 1942671, at *8 (N.D. Ill. 2018) ("Bare assertions that such policies existed, without more, will not suffice."). A complaint must offer enough factual content to give rise to a plausible inference that a practice was "widespread." *See, e.g.*, *Wilson*, 742 F.3d at 780.

Here, Jensen runs into a Rule 8 roadblock. The complaint offers little more than a conclusion that Cook County had a widespread practice of over-designating jobs as safety-related. The complaint includes an oblique reference to a "list." *Id.* at ¶ 75.

That allegation does not shed much light. It is anyone's guess what that list contains. The complaint does not reveal how many positions were designated as safety-sensitive. The complaint also does not allege how many positions were *improperly* designated as safety-sensitive.

Also, the complaint doesn't shed any light on why the Medical Examiner's Office classified other employees as safety-sensitive. Jensen claims that his position was designated as safety-sensitive simply because he had a driver's license. *See* Am. Cplt., at ¶¶ 74–75 (Dckt. No. 6). But the complaint offers no facts about the decision of the Medical Examiner's Office to designate other jobs as safety-sensitive. *Id.*

A raw conclusion and a bare reference to a "list" is not enough to allege a widespread practice. So, Jensen has not adequately pled a widespread custom of over-designating positions as safety-related.

Next, Jensen alleges that Dr. Arunkumar, Ertler, and McNeil – individuals with final policymaking authority – took actions that violated his constitutional rights. *See* Am. Cplt., at ¶¶ 46–48, 76 (Dckt. No. 6); *see also* Pl.'s Resp., at 5 (Dckt. No. 33).

18

"In order to have final policymaking authority, an official must possess 'responsibility for making law or setting policy,' that is, 'authority to adopt rules for the conduct of government.'" *Killinger v. Johnson*, 389 F.3d 765, 772 (7th Cir. 2004) (citing *Rasche v. Vill. of Beecher*, 336 F.3d 588, 599 (7th Cir. 2003)).

"A person's status as a final policymaker under § 1983 is a question of state or local law. Final policymaking authority may be granted directly by statute or delegated or ratified by an official having policymaking authority." *Kujawski v. Bd. of Comm'rs of Bartholomew Cnty.*, 183 F.3d 734, 737 (7th Cir. 1999) (citation omitted).

"Not every municipal official with discretion is a final policymaker; authority to make final policy in a given area requires more than mere discretion to act." *Milestone v. City of Monroe*, 665 F.3d 774, 780 (7th Cir. 2011). "Whether a public official has final policymaking authority often turns on whether his decisions are subject to review by a higher official or other authority." *Id.*

But "mere unreviewed discretion to make hiring and firing decisions" is not enough for *Monell* liability. *See Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 676 (7th Cir. 2009) (cleaned up). The key point is whether the individual in question has authority to *set policy* for hiring and firing – not simply final authority to hire and fire. *See id.*; *see also Vodak v. City of Chicago*, 639 F.3d 738, 748 (7th Cir. 2011) (opining that the relevant question is "whether . . . the decisionmaker [] was at the apex of authority for the action in question") (citation and internal quotation marks omitted).

To determine whether a decisionmaker has final policymaking authority, courts make three inquiries: "(1) whether the official is constrained by policies of other officials or legislative bodies; (2) whether the official's decision on the issue in question is subject to meaningful

review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority." *Kristofek v. Vill. of Orland Hills*, 832 F.3d 785, 799 (7th Cir. 2016) (citation and internal quotation marks omitted).

"[T]he Seventh Circuit has recognized officials as de facto policymakers for purposes of *Monell* liability when an official makes hiring decisions as the official sees fit without any laws or policies to guide the official's decisionmaking." *Billups-Dryer v. Vill. of Dolton*, 2023 WL 6290543, at *3 (N.D. Ill. 2023) (Maldonado, J.); *see also Valentino* 575 F.3d at 677 (concluding that a plaintiff could proceed with a *Monell* claim because the plaintiff provided evidence that an individual's personnel decisions were not reviewed); *Gschwind v. Heiden*, 692 F.3d 844, 848 (7th Cir. 2012) (reversing summary judgment for defendants on a *Monell* claim brought by a fired teacher when the superintendent asserted that it was the school district's policy to allow principals to "make evaluation and employment decisions as they see fit").

To survive a motion to dismiss a *Monell* claim based on a termination decision, a complaint must plead facts that permit the inference that the terminating individual "possessed or was delegated final policymaking authority for termination decisions." *Connelly v. Cook Cnty. Assessor's Off.*, 583 F. Supp. 3d 1142, 1149 (N.D. Ill. 2022); *see also Kristofek v. Vill. of Orland Hills*, 712 F.3d 979, 987 (7th Cir. 2013) (concluding that a plaintiff "stated, albeit barely, a plausible claim that [a chief of police] had at least *de facto* authority to set policy for hiring and firing," by alleging that the chief "was fully in charge of the police department and that his firing decisions were not reviewed"); *Molloy v. Acero Charter Sch., Inc.*, 2019 WL 5101503, at *5 (N.D. Ill. 2019) (concluding that *Monell* claim survived a motion to dismiss because the plaintiff alleged that the defendant "possessed and was delegated final policymaking for personnel issues"); *Thuet v. Chicago Pub. Sch.*, 2020 WL 5702195, at *4 (N.D. Ill. 2020) (concluding that

the plaintiffs had stated a *Monell* claim under a final policymaking authority theory by referring to guidelines that suggested that the defendant "not only made hiring and firing decisions in individual cases, but also set policy for termination").

Defendants concede that the County's ordinance vested final policymaking authority in Dr. Arunkumar. *See* Defs.' Reply in Support of Mtn. to Dismiss, at 5 (Dckt. No. 39). But they contend that McNeil and Ertler lacked final policymaking authority. *Id.* And Defendants argue that the complaint does not allege that Dr. Arunkumar approved Jensen's firing. *Id.* at 5 n.2.

The complaint alleges that Dr. Arunkumar attended the pre-disciplinary hearing on October 25, 2021. *See* Am. Cplt., at ¶ 73 (Dckt. No. 6). Jensen lost access to his work email on November 8, 2021 – two weeks after the hearing – and was terminated on November 18, 2021. *Id.* at ¶¶ 78–79. Given Dr. Arunkumar's involvement in the disciplinary hearing two weeks earlier, Jensen plausibly alleges that Dr. Arunkumar approved the termination. The inference isn't strong, but it is strong enough to satisfy the standard for notice pleading at this early stage.

To be sure, Ertler – not Dr. Arunkumar – sent Jensen the termination notice. *Id.* at ¶ 79. If Dr. Arunkumar did not approve the termination, then Ertler acted with "at least *de facto* authority to set policy for hiring and firing." *Kristofek v. Vill. of Orland Hills*, 712 F.3d 979, 987 (7th Cir. 2013). An individual with "unfettered discretion to . . . fire whomever he please[s]" has final policymaking authority. *See id.* (quoting *Kujawski v. Bd. of Comm'rs of Bartholomew Cnty.*, 183 F.3d 734, 740 (7th Cir. 1999)); *see also Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 677 (7th Cir. 2009).

In other words, if Dr. Arunkumar was not involved in Jensen's firing, then it was all up to Ertler – with no review from above. So, Ertler might have sat in the driver's seat in practice, if

not on paper. And someone with at least *de facto* authority (either Dr. Arunkumar or Ertler) approved Jensen's firing.

McNeil was not directly involved in the termination process. But Jensen pled that she turned his return-to-work requirements into a moving target. *See* Am. Cplt., at ¶¶ 60–61 (Dckt. No. 6). Initially, McNeil reported that he needed to meet a .25 ng THC threshold. *Id.* at ¶ 60. Later, she said that the magic number was .15 ng. *Id.* at ¶ 61.

So, the complaint supports an inference that McNeil had *de facto* final policymaking authority to amend the Drug and Alcohol Policy as she saw fit. For now, that's enough.

Again, the situation might look different at the summary judgment stage, after the facts have come to light during discovery. But at this early stage, the complaint contains enough factual content to allege a *Monell* claim based on a decision by a person with final policymaking authority.

In sum, Jensen can pursue his Fourth Amendment claim against Cook County under a theory that someone with final policymaking authority acted to violate his constitutional rights. Jensen may therefore proceed with his claim about an unreasonable search (Count I) against all Defendants.

## II. First Amendment Retaliation Claim (Count II)

The next claim is a First Amendment retaliation claim against Cook County, Dr. Arunkumar, and Ertler. *See* Am. Cplt., at ¶¶ 94–99 (Dckt. No. 6).

"The First Amendment, incorporated against the states through the Fourteenth Amendment, shields government employees from retaliation for engaging in protected speech." *Diadenko v. Folino*, 741 F.3d 751, 755 (7th Cir. 2013). "To prevail on a First Amendment retaliation claim, a plaintiff must establish three elements. First, he must show he engaged in

22

protected First Amendment activity. Second, he must show an adverse action was taken against him. Third, he must show his protected conduct was at least a motivating factor of the adverse action." *Holleman v. Zatecky*, 951 F.3d 873, 878 (7th Cir. 2020).

Defendants focus on the first element. They contend that the First Amendment did not protect Jensen's speech. *See* Defs.' Mtn. to Dismiss, at 4–5 (Dckt. No. 29). Defendants also make arguments against liability for the County and the Individual Defendants.

### A.     Protected Speech

The first question is whether Jensen engaged in protected speech. "[P]ublic employees do not surrender all their First Amendment rights by reason of their employment." *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006).

The First Amendment protects "a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Sweet v. Town of Bargersville*, 18 F.4th 273, 278 (7th Cir. 2021) (quoting *Garcetti*, 547 U.S. at 417). When an employee speaks in this capacity, "courts should attempt to engage in a delicate balancing of the competing interests surrounding the speech and its consequences." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2423 (2022) (cleaned up).

However, the First Amendment "does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities." *Garcetti*, 547 U.S. at 424; *see also Kingman v. Frederickson*, 40 F.4th 597, 601 (7th Cir. 2022). "If a public employee speaks pursuant to his or her official duties . . . the Free Speech Clause generally will not shield the individual from an employer's control and discipline because that kind of speech is – for constitutional purposes at least – the government's own speech." *Kennedy*, 142 S. Ct. at 2423. And if the "overall point" of the speech "was to express a purely personal grievance, then the

23

First Amendment will not help" the speaker. *See Meade v. Moraine Valley Community College*, 770 F.3d 680, 684 (7th Cir. 2014).

Jensen's complaints came in two flavors. First, he sounded the alarm on a wasteful, noncompliant purchase of camera equipment. *See* Am. Cplt., at ¶¶ 24–25 (Dckt. No. 6). Second, he complained about the hot and humid conditions in the autopsy room. *Id.* at ¶¶ 27–35.

Defendants point out that Jensen's complaints were internal. *See* Defs.' Mtn. to Dismiss, at 5 (Dckt. No. 29). As they see it, Jensen didn't try to inform the public about wasteful spending or unbearable workplace conditions. He simply informed his supervisors within the Medical Examiner's Office.

For his part, Jensen argues that wasteful government spending and unsafe workplace conditions are matters of public concern. *See* Pl.'s Resp., at 8 (Dckt. No. 33). He also believes that his complaints were not part of his professional duties. *Id.* at 9.

"The Seventh Circuit has consistently ruled that a public employee speaks pursuant to his official duties when he reports internal misconduct through only internal channels." *Younge v. Berman*, 2023 WL 2374781, at *3 (N.D. Ill. 2023) (citing cases); *see also Roake v. Forest Pres. Dist. of Cook Cnty.*, 849 F.3d 342, 346 (7th Cir. 2017) (concluding that a police officer did not plausibly allege that he made complaints as a citizen when he shared complaints "only with his employer, and the complaints focused exclusively on official misconduct by his fellow officers"); *Spiegla v. Hull*, 481 F.3d 961, 967 (7th Cir. 2007) (opining that the plaintiff "acted as a government employee" in reporting possible misconduct to a supervisor and seeking clarification about a policy she believed may have been breached); *Kubiak v. City of Chicago*, 810 F.3d 476, 482 (7th Cir. 2016) (holding that an employee's internal speech about inappropriate treatment at work "was intimately connected with her professional duties" and thus

24

made as a public employee); *Tamayo v. Blagojevich*, 526 F.3d 1074, 1091–92 (7th Cir. 2008) ("[C]ourts have determined that reports by government employees to their superiors concerning alleged wrongdoing in their government office were within the scope of their job duties, and, therefore, the employees were not speaking as private citizens.").

Jensen was hardly shouting from the rooftops when he spoke out. He "did not make a public statement, discuss politics with a coworker, write a letter to newspapers or legislators, or otherwise speak as a citizen." *Spiegla*, 481 F.3d at 967. Instead, Jensen complained internally, in his official capacity. He thought misconduct was underfoot at the Medical Examiner's Office, so he informed others within the Office.

Strictly speaking, Jensen's professional duties may not have required him to raise concerns about the camera equipment or the autopsy room conditions. But the Seventh Circuit has cautioned against focusing simply on "core job functions." *See Kubiak*, 810 F.3d at 482; *Davis v. Cook Cnty.*, 534 F.3d 650, 653 (7th Cir. 2008). Instead, courts should ask if an employee's speech is "intimately connected" to his job. *See Kubiak*, 810 F.3d at 482.

And here, the answer is "yes." Jensen's speech was "intimately connected" with his job duty. He took photos of autopsies. He used camera equipment. And he worked in the autopsy rooms. So, when he chose to speak up internally about issues with camera equipment and conditions in the autopsy room, he was acting in an official capacity. He was not engaging in protected speech.

Trying a different tack, Jensen points out that his complaints were not only internal – he also complained to the Cook County Inspector General and OSHA. *See* Pl.'s Resp., at 8 (Dckt. No. 33). And Jensen contends that Defendants retaliated against him based on those complaints. *Id.*; *see also* Am. Cplt., at ¶¶ 52, 66–67 (Dckt. No. 6).

25

Defendants argue that Jensen's allegations include too few details about the nature of Jensen's complaints to the Inspector General. *See* Defs.' Reply at 7–8 (Dckt. No. 39). And they think that Jensen runs into a timing issue for the OSHA complaint. Because Jensen was already in the Magellan substance abuse program when he filed the OSHA complaint, Defendants believe the Medical Examiner's Office couldn't have retaliated against him for contacting OSHA. *Id.* at 8.

The Court agrees with Defendants about the complaint to the Inspector General, but disagrees with Defendants about the complaint to OSHA.

Start with the complaint to the Inspector General. Jensen merely alleges that he complained to the Inspector General "about what occurred at CCMEO." *See* Am. Cplt., at ¶ 52 (Dckt. No. 6). Jensen goes on to allege that the Inspector General informed him that no one had reported him for being intoxicated at work. *Id.*

Those allegations are too foggy. The Court cannot tell whether Jensen complained about the photography equipment, or about the hot and humid rooms, or about how supervisors within the Medical Examiner's Office were treating him. As things stand, Jensen's complaints to the Inspector General are insufficient to support a First Amendment claim.

But Jensen's OSHA complaint is a different story.

Jensen alleges that he submitted an OSHA complaint in late June 2021, and that complaint was reinstated on July 8, 2021. *See* Am. Cplt., at ¶ 66 (Dckt. No. 6).

On July 12, 2021 – just a few days after the complaint was reinstated – Ertler sent Jensen a pre-disciplinary hearing notice claiming that Jensen had engaged in "job abandonment." *Id.* at ¶ 67. That timeline supports an inference of retaliation.

To be sure, the complaint doesn't shed much light on the nature of Jensen's complaints to OSHA. However, OSHA regulates workplace conditions – and Jensen previously had sounded the alarm on unsafe temperatures and humidity in the autopsy room. So, the Court reasonably infers that Jensen's OSHA complaint related to the autopsy room conditions.

As Defendants acknowledge, OSHA complaints *could* be protected speech. *See* Def.'s Reply, at 8 (Dckt. No. 39); *see also Robertson v. Nevada ex rel. Dep't of Health & Hum. Servs.*, 2017 WL 3037790, at *3 (D. Nev. 2017) (considering OSHA report as protected speech); *Shanks v. Vill. of Catskill Bd. of Trustees*, 653 F. Supp. 2d 158, 167 (N.D.N.Y. 2009) (denying summary judgment on First Amendment retaliation claim based on OSHA complaint). *But see, e.g.*, *Ross v. New York City Dep't of Educ.*, 935 F. Supp. 2d 508, 520 (E.D.N.Y. 2013) (granting summary judgment on First Amendment retaliation claim where teacher made OSHA complaint in his professional capacity – not as a citizen on a matter of public concern).

Defendants point out that OSHA complaints are usually anonymous, which undercuts Jensen's theory that his supervisors at the Medical Examiner's Office would have known about the complaint. *See* Def.'s Reply, at 8–9 (Dckt. No. 39). Defendants might be right. But that argument is a better fit in a motion for summary judgment.

In sum, the complaint states a retaliation claim under the First Amendment by alleging that the Medical Examiner's Office retaliated against Jensen for his complaint to OSHA. But the rest of the allegations fall short.

### B.    *Monell* Liability

Defendants argue that Jensen has not satisfied the *Monell* requirements for his First Amendment retaliation claim against Cook County. Jensen once again argues that Cook County had a widespread custom of over-designating employees as safety-sensitive, and that Dr.

27

Arunkumar, Ertler, and McNeil had final policymaking authority to override the terms of the Drug and Alcohol Policy.  *See* Pl.'s Resp., at 11 (Dckt. No. 33).

The Court's analysis on *Monell* liability for Count I applies here, too.  Jensen can proceed with his theory about final policymaking authority.  But he has not done enough to advance his theory that Cook County had a widespread custom of improperly designating employees as safety-sensitive.

### C.       Individual Defendants (Dr. Arunkumar & Ertler)

Defendants contend that Jensen's First Amendment claim fails against Dr. Arunkumar and Ertler because Jensen has failed to plead that they personally caused his drug tests and termination.  *See* Defs.' Mtn. to Dismiss, at 7 (Dckt. No. 29).

"Individual liability pursuant to § 1983 requires personal involvement in the alleged constitutional deprivation."  *Est. of Perry v. Wenzel*, 872 F.3d 439, 459 (7th Cir. 2017).

A supervisor cannot be held liable simply because of his or her supervisory status*.  See Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001).  "To be personally liable, a supervisor must 'know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see.'"  *See Kemp v. Fulton Cnty.*, 27 F.4th 491, 498 (7th Cir. 2022) (quoting *Matthews v. City of East St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012)).

Jensen only plausibly pled that the OSHA complaint constituted protected speech.  So, the Court will only consider actions that Ertler and Dr. Arunkumar allegedly took in response to the OSHA complaint.

Jensen alleges that, a few days after OSHA reinstated his complaint, Ertler sent a pre-disciplinary hearing notice claiming that Jensen took too long to return to work and committed "job abandonment."  *See* Am. Cplt., at ¶¶ 66–67 (Dckt. No. 6).  Ertler then attended

Jensen's pre-disciplinary hearing.  *Id.* at ¶¶ 68–69.  Based on that timeline, Jensen has pled facts suggesting that Ertler personally retaliated against him for the OSHA complaint.  It's not a lot, but it's enough to get a foot in the door.

However, Jensen does not allege whether Dr. Arunkumar attended the hearing, or even knew about it.  So, the complaint does not suggest that Dr. Arunkumar was personally involved in the alleged First Amendment retaliation.

In sum, Count II is dismissed in part.  Count II survives against Cook County and Ertler, but not Dr. Arunkumar.  Jensen can proceed with his First Amendment retaliation claim only to the extent that Jensen alleges that Cook County and Ertler retaliated against him for his OSHA complaint.

## III.   Due Process (Count III)

Count III is a due process claim under the Fourteenth Amendment against all Defendants. *See* Am. Cplt., at ¶¶ 100–09 (Dckt. No. 6).

Under the Fourteenth Amendment, no state shall "deprive any person of life, liberty, or property, without due process of law."  *See* U.S. Const. amend. XIV, § 1.  "A procedural due process claim requires a two-fold analysis.  First, [the court] must determine whether the plaintiff was deprived of a protected interest; second, [the court] must determine what process is due." *Pugel v. Bd. of Trs. of Univ. of Illinois*, 378 F.3d 659, 662 (7th Cir. 2004).

Defendants focus on the second step, so the Court will, too.

Basically, Defendants claim that they provided Jensen sufficient process because he had two pre-disciplinary hearings.  *See* Defs.' Mtn. to Dismiss, at 9 (Dckt. No. 29).  In response, Jensen argues that his union failed to grieve the discipline, so he was denied a post-deprivation hearing.  *Id.*

Jensen does not address the procedural due process claim in his response brief. *See generally* Pl.'s Resp. (Dckt. No. 33). So, he has waived any arguments against dismissal. *See, e.g.*, *Farnham v. Windle*, 918 F.2d 47, 51 (7th Cir. 1990) (concluding that plaintiff waived right to brief additional legal theories not briefed in opposing motion to dismiss); *Wojtas v. Cap. Guardian Tr. Co.*, 477 F.3d 924, 926 (7th Cir. 2007) (concluding that plaintiff waived argument by failing to address it in response to motion to dismiss); *Baumeister v. Exelon Corp.*, 2023 WL 6388064, at *10 (N.D. Ill. 2023) (same).

The waiver is reason enough to grant the motion. Even so, the Court will consider whether the complaint alleges a plausible due process claim.

As Defendants point out, Jensen alleges that his union – a non-party – failed to grieve his termination and discipline. *See* Am. Cplt., at ¶ 109 (Dckt. No. 6). Because Jensen brings Count III under section 1983, he must show that Defendants had personal involvement in the constitutional violation. *See Wenzel*, 872 F.3d at 459. Jensen does not plead that Defendants were involved in the union's decision not to grieve.

The *union's* failure to grieve cannot form the basis of a procedural due process claim against *Defendants*. So, Jensen cannot proceed with Count III to the extent that he argues about the union's non-grievance.

Jensen also argues that Defendants violated his due process rights by failing to respond to his requests for information about the legal and policy grounds for his drug treatment. *See* Am. Cplt., at ¶ 108 (Dckt. No. 6). But Jensen does not allege that Defendants were *required* to provide that information. In other words, Jensen does not allege that this process was *due*. So, he cannot proceed with a due process claim on this theory.

The Due Process Clause, in and of itself, does not require discovery before a pre-deprivation hearing. Something else could create that right, but Jensen alleges no such thing. Jensen is not alleging, for example, that the employee manual guaranteed him a right to discovery, but the Medical Examiner's Office took that right away.

And even if he did, a deprivation of a state procedural right does not give rise to a claim under the Due Process Clause. The Due Process Clause does not constitutionalize state procedural rules. *See, e.g.*, *Lavite v. Dunstan*, 932 F.3d 1020, 1033 (7th Cir. 2019) ("State and local law can create and confer constitutionally protected liberty and property interests, but state and local procedural protections do not by themselves give rise to federal due process interests."); *Bochra v. Dep't of Educ.*, 2024 WL 808061, at *2 (7th Cir. 2024) ("Procedural rules alone . . . do not create a property or liberty interest."); *FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574, 592 (7th Cir. 2021) ("Process alone is not a protected interest subject to due process protections."); *Lafayette Linear v. Village of Univ. Park*, 887 F.3d 842, 844 (7th Cir. 2018) ("[P]rocedural rights based on a contract or an ordinance have nothing to do with the Due Process Clause, which protects substantive interests – rights in life, liberty, or property – rather than state-created procedures."); *Manley v. Law*, 889 F.3d 885, 893 (7th Cir. 2018) ("[T]he federal Constitution does not enforce compliance with state procedural rules."); *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983) ("Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement.").

A desire for information before a hearing, without more, is not a basis for a due process claim. After all, the Federal Rules of Civil Procedure did not spring into existence until 1937, so there was no discovery in federal court during most of our nation's history.

As a final tack, Jensen alleges that Defendants violated his right to due process when they stopped his pay and benefits in June 2021. *See* Am. Cplt., at ¶ 107 (Dckt. No. 6). Jensen alleges that Defendants cut off his pay before discipline issued and before opportunity for a hearing, even though Dr. Sefer had determined that he was eligible for sick time. *Id.*

Defendants respond by pointing out the lack of any allegation of personal involvement. According to Defendants, Jensen has not pled that Dr. Arunkumar, Ertler, or McNeil *personally* deprived him of the process due. *See* Defs.' Mtn. to Dismiss, at 10 (Dckt. No. 29).

Jensen contends that the Medical Examiner's Office stopped paying him on June 11, 2021, before any discipline or hearing occurred. *See* Am. Cplt., at ¶ 39 (Dckt. No. 6). But Jensen does not link the pay stoppage to any action by Dr. Arunkumar, Ertler, or McNeil.

To be sure, Dr. Arunkumar and Ertler both held supervisory positions within the Medical Examiner's Office. But Jensen does not plead facts suggesting that Dr. Arunkumar and Ertler knew about the pay stoppage, let alone directed it.

Jensen has not pled sufficient facts to show that Dr. Arunkumar and Ertler had personal involvement in the pay stoppage. *See Kemp*, 27 F.4th at 498. He hasn't pled any facts suggesting that McNeil was personally involved in stopping his pay, either.

The allegations about the pay stoppage are also too thin to support a *Monell* claim. Jensen does not contend that the County had a policy or widespread custom of ceasing pay without a disciplinary notice or hearing.

And the complaint does not reveal *who* decided to cut off Jensen's pay and benefits. So, the complaint does not allege that someone with final policymaking authority was involved in the decision to stop Jensen's pay. Thus, Jensen does not plausibly plead a *Monell* claim.

Overall, the complaint does not contain enough factual content to give rise to a plausible inference of a due process violation. Count III is dismissed.

## IV.  State-Law Claims (Counts IV, V, & VI)

Counts IV, V, and VI are a trio of claims under state law. Defendants make the same arguments about each claim, so the Court will bundle them together.

As a refresher, Count IV is a retaliation claim under the Illinois Whistleblower Act, 740 ILCS 174/1 *et seq.*, against all Defendants. *See* Am. Cplt., at ¶¶ 113–17 (Dckt. No. 6). Count V is a common law retaliatory discharge claim against all Defendants. *Id.* at ¶¶ 118–21. And Count VI is an intentional infliction of emotional distress claim against Dr. Arunkumar, Ertler, and McNeil.[4] *Id.* at ¶¶ 122–25.

Defendants argue that the state-law claims are untimely. *See* Defs.' Mtn. to Dismiss, at 10 (Dckt. No. 29). They point to the one-year statute of limitations under the Illinois Local Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/8-101(a). *Id.* at 10–11. And they contend that Jensen's claims are untimely to the extent that they rest on discrete events occurring before October 11, 2021 (*i.e.*, one year before he sued). *Id.* at 11.

---

[4] "To prove an intentional infliction of emotional distress claim under Illinois law, a plaintiff must show that: "(1) the defendants' conduct was extreme and outrageous; (2) the defendants knew that there was a high probability that their conduct would cause severe emotional distress; and (3) the conduct in fact caused severe emotional distress." *Swearnigen-El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 864 (7th Cir. 2010) (citing *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 211 (Ill. 1992)). "[M]ere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" do not constitute *severe* emotional distress. *See McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988) (citing Restatement (Second) of Torts § 46). "This standard is quite high. In order to meet the threshold for intentional infliction of emotional distress, the defendant's conduct must extend beyond the bounds of human decency and be considered intolerable in a civilized community." *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 747 (7th Cir. 2008). Here, the complaint alleges that Defendants engaged in extreme and outrageous conduct "by subjecting Jensen to unconstitutional drug testing in violation of the DAP [*i.e.*, the Drug and Alcohol Policy], targeting Jensen for retaliation on an ongoing basis following his protected conduct, discontinuing Jensen's pay and benefits, issuing Jensen unwarranted and retaliatory discipline, and ultimately terminating Jensen on unlawful grounds." *See* Cplt., at ¶ 123 (Dckt. No. 6). The motion to dismiss does not make an argument about whether the allegations of the complaint could give rise to a claim, so the Court will not reach it.

Jensen believes that his claims are timely because he pled a continuing course of retaliatory events that culminated in his firing in November 2021. *See* Pl.'s Resp., at 12 (Dckt. No. 33). In Jensen's view, none of his claims accrued until he got the boot on November 18, 2021 – less than a year before he sued in October 2022. *Id.* at 12–13.

The statute of limitations is an affirmative defense. "[A] plaintiff ordinarily need not anticipate and attempt to plead around affirmative defenses." *Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 939 (7th Cir. 2016). An exception applies if "the allegations of the complaint . . . set forth everything necessary to satisfy the affirmative defense." *United States v. Lewis,* 411 F.3d 838, 842 (7th Cir. 2005).

"Dismissal is appropriate *only* when the factual allegations in the complaint unambiguously establish all the elements of the defense." *Hyson USA*, 821 F.3d at 939 (cleaned up). "In other words, the plaintiff must affirmatively plead himself out of court[.]" *Chicago Bldg. Design, P.C. v. Mongolian House, Inc.*, 770 F.3d 610, 614 (7th Cir. 2014).

The Tort Immunity Act imposes a one-year statute of limitations, measured from the moment of claim accrual. "No civil action . . . may be commenced in any court against a local entity or any of its employees for any injury unless it is commenced within one year from the date that the injury was received *or the cause of action accrued*." *See* 745 ILCS 10/8-101(a) (emphasis added).

"Generally, a limitations period begins to run when facts exist that authorize one party to maintain an action against another." *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 85 (Ill. 2003).

"However, under the 'continuing tort' or 'continuing violation' theory, where the tort involves continuous or repeated injurious behavior, by the same actor and of a similar nature, the limitations period is held in abeyance and the plaintiff's cause of action does not accrue until the

date the final injury occurs or the tortuous [sic] acts cease." *Taylor v. Bd. of Educ. of City of Chicago*, 10 N.E.3d 383, 395 (Ill. App. Ct. 2014); *see also Logan v. City of Chicago*, 4 F.4th 529, 540 (7th Cir. 2021). "A continuing act is not established by ongoing injuries resulting from one discreet [sic] act, but instead involves viewing the defendant's conduct as a series of tortuous [sic] acts amounting to a continuous whole." *See Taylor*, 10 N.E.3d at 396.

"A continuing violation or tort is occasioned by continuing unlawful acts and conduct, not by continual ill effects from an initial violation." *Feltmeier*, 798 N.E.2d at 85. "So 'where there is a single overt act from which subsequent damages may flow, the statute begins to run on the date the defendant invaded the plaintiff's interest and inflicted injury . . . despite the continuing nature of the injury.'" *Logan*, 4 F.4th at 540 (quoting *Feltmeier*, 798 N.E.2d at 85).

"The continuing tort theory has been held applicable to claims for emotional distress." *Taylor*, 10 N.E.3d at 396. Courts in this district have applied the continuing tort theory to claims under the Illinois Whistleblower Act, too. *See, e.g.*, *Spalding v. City of Chicago*, 186 F. Supp. 3d 884, 919 (N.D. Ill. 2016); *Conway v. City of Chicago*, 2021 WL 4206793, at *10 (N.D. Ill. 2021) (Lee, J.).

At this point, the Court needs to unbundle the bundle of Jensen's state-law claims. The analysis is different for the Whistleblower Act claim and the intentional infliction of emotional distress claim (on the one hand), and the retaliatory discharge claim (on the other).

The Whistleblower Act claim and the intentional infliction of emotional distress claim involve conduct occurring before and within the limitations period. Jensen alleges a series of retaliatory events that began in late 2020 and culminated in his November 2021 termination. *See* Am. Cplt., at ¶¶ 3–10, 113–21 (Dckt. No. 6). For example, he complained about the camera

equipment in December 2020, and was not allowed to use the bank of leave time for COVID-19 soon after. *Id.* at ¶¶ 24–26.

Jensen also contends that he suffered ongoing emotional distress that began with the unlawful drug test in June 2021 and ended when he was fired in November 2021. *Id.* at ¶ 123. The conduct at issue took place within and outside the limitations period.

Jensen alleges a course of unlawful conduct that began before the limitations period, and then continued into the limitations period. So, the complaint does not plead itself out of court when it comes to the statute of limitations for the claim under the Whistleblower Act and the claim of intentional infliction of emotional distress. *See Spalding*, 186 F. Supp. 3d at 919 (denying summary judgment on Illinois Whistleblower Act claim where defendants committed retaliation both before and during limitations period); *Conway*, 2021 WL 4206793, at *10 (denying motion to dismiss as untimely where actor "allegedly engaged in retaliatory actions well into the one-year period preceding the filing of [plaintiff's] complaint"); *Taylor*, 10 N.E.3d at 396.

At this early stage, this Court is not deciding that the continuing tort theory applies. Instead, the point is simply that the complaint alleges enough to say that the continuing tort theory might apply. Maybe, after viewing everything with the benefit of discovery, this Court will see things differently at summary judgment. But for now, the claim survives.

The retaliatory discharge claim is a different animal when it comes to claim accrual. "[T]he tort of retaliatory discharge is, by its nature, not a continuing tort but rather one characterized by a single incident." *Evans v. City of Chicago*, 1993 WL 273365, at *6 (N.D. Ill. 1993). So, the continuing tort theory does not apply to retaliatory discharge claims. The claim is about a discrete event, and the discharge itself starts the clock.

Even so, Jensen's retaliatory discharge claim is timely. He was fired on November 18, 2021. He sued Defendants on October 11, 2022. He cleared the one-year statute of limitations hurdle with about a month to spare. So Count V survives.

In sum, Defendants' motion to dismiss Counts IV through VI as untimely is denied.

## V.    Illinois Minimum Wage Law (Count VII)

The final count is a claim under the Illinois Minimum Wage Law, 820 1LCS 105/1 *et seq*. *See* Am. Cplt., at ¶¶ 126–31 (Dckt. No. 6). Jensen brings that claim against Cook County, Dr. Arunkumar, and Ertler.

Defendants first contend that Jensen's claim fails because the Minimum Wage Law has a three-year statute of limitations, and Jensen "does not plead on which dates he was not properly paid." *See* Defs.' Mtn. to Dismiss, at 11 (Dckt. No. 29).

Jensen pled that he was required to work between 15 and 45 minutes on "most" mornings without compensation. *See* Am. Cplt., at ¶ 128 (Dckt. No. 6). He also pled that he "regularly" worked through lunch without pay or overtime. *Id.* at ¶ 130. Jensen did not plead facts about his pay rate, or provide dates when he worked without pay.

It is true that the complaint does not pin down when, exactly, Jensen did not receive his pay. Even so, the complaint didn't have to pin down the dates, either. The Federal Rules did not require any greater particularity when it came to the chronology.

Jensen was not required to pin down specific dates at this stage of the proceedings. *See, e.g.*, *Victoria v. Alex Car, Inc.*, 2012 WL 1068759, at *5 (N.D. Ill. 2012) ("[T]here is no rule of law that requires Plaintiffs to allege their hourly wage, the dates on which the alleged violations took place, or the specific tasks they performed off the clock."); *Nehmelman v. Penn Nat. Gaming, Inc.*, 790 F. Supp. 2d 787, 797 (N.D. Ill. 2011) (opining that minimum wage law claims

are "generally simple" and "do not require a fuller set of factual allegations to render them plausible."); *Divine v. Volunteers of Am. of Illinois*, 319 F. Supp. 3d 994, 1000 (N.D. Ill. 2018) (collecting cases).

A motion to dismiss can get traction based on the statute of limitations only if the complaint itself shows that it is untimely. Here, the complaint is vague when it comes to the timeline, so it isn't infirm. The complaint itself does not undermine its own timeliness.

Jensen has not pled many specifics. But Jensen has pled enough to satisfy the "liberal" Rule 8 pleading standard. *See Srivastava v. Daniels*, 409 F. App'x 953, 955 (7th Cir. 2011).

In sum, Jensen has not pled himself out of court on the statute of limitations. Rule 8 did not require him to plead his claim with greater granularity. So, the Court will not dismiss Count VII on statute of limitations grounds.

That said, if Defendants foresee a statute of limitations problem on the horizon, they can raise the statute of limitations defense in their answer. *See Perry v. Sullivan*, 207 F.3d 379, 382 (7th Cir. 2000) ("Rule 8 specifically requires statute of limitations defenses to be stated in the defendant's responsive pleading . . . .") (citation omitted). Maybe some or all of the claim will not survive at the summary judgment stage, but that question is reserved for a later day.

Shifting gears, Defendants challenge Count VII as applied to Dr. Arunkumar and Ertler because the Minimum Wage Law does not support individual liability. *See* Defs.' Mtn. to Dismiss, at 11 (Dckt. No. 29). They point out that the complaint did not allege that Dr. Arunkumar or Ertler personally adjusted Jensen's time, or that they controlled how Jensen was paid. *See* Defs.' Reply, at 10 (Dckt. No. 39).

The Minimum Wage Law includes a broad definition of "employer." *See* 820 ILCS 105/3(c). "'Employer' includes any individual, partnership, association, corporation, limited

38

liability company, business trust, governmental or quasi-governmental body, or any person or group of persons acting directly or indirectly in the interest of an employer in relation to an employee, for which one or more persons are gainfully employed on some day within a calendar year." *Id.*

Illinois law permits a claim against individuals under the Minimum Wage Law. *See Cruz v. Noonan*, 2013 Ill. Cir. LEXIS 7, at *12 (Ill. Cir. Ct. 2013) (noting that the statute "has been held to establish personal liability"). But Illinois courts do not appear to have interpreted the breadth of the Minimum Wage Law's definition of "employer."

Absent "Illinois case law interpreting an Illinois wage statute, a court may look for guidance to federal cases interpreting an analogous federal statute, namely the Fair Labor Standards Act (FLSA) (29 U.S.C. § 201 *et seq.* (2006))." *Lewis v. Giordano's Enters., Inc.*, 921 N.E.2d 740, 745 (Ill. App. Ct. 2009).

The FLSA uses a similar definition of "employer." *See Reynoso v. Motel LLC*, 71 F. Supp. 3d 792, 796 n.6 (N.D. Ill. 2014) (noting the Minimum Wage Law and FLSA "use[] essentially the same definition of 'employer'"). Under the FLSA, an individual defendant can constitute an "employer," "provided the defendant [employee] had supervisory authority over the complaining employee and was responsible in whole or part for the alleged violation." *Riordan v. Kempiners*, 831 F.2d 690, 694 (7th Cir. 1987) (citing 29 U.S.C. § 203(d)); *see also Noe v. Smart Mortg. Ctrs., Inc.*, 2022 WL 846183, at *3 (N.D. Ill. 2022).

The complaint lacks facts showing whether Dr. Arunkumar or Ertler were "responsible in whole or in part" for the alleged violation. *See Riordan*, 831 F.2d at 694. Jensen alleges that he was "required" to come in early, and work through lunch, on most days. *See* Am. Cplt., at ¶¶ 126–131 (Dckt. No. 6). But Jensen does not allege *who* imposed these requirements.

39

As things stand, the complaint does not do enough to state a plausible claim against Dr. Arunkumar or Ertler, because the complaint does not allege any personal involvement by Dr. Arunkumar or Ertler when it came to decisions about Jensen's pay. Therefore, Count VII is dismissed against Dr. Arunkumar and Ertler.

In a final salvo, Defendants argue that Jensen failed to assert that he is a non-exempt employee under the Illinois Minimum Wage Law. *See* Defs.' Reply, at 11 (Dckt. No. 39).

However, the complaint alleges that Jensen clocked in on arrival, and that the Medical Examiner's Office manually adjusted his time sheets. *See* Am. Cplt., at ¶¶ 128–29 (Dckt. No. 6). Exempt employees do not usually log time. They typically are paid the same regardless of when they clock in, or whether they take lunch. So Jensen has plausibly alleged that he is a non-exempt employee within the meaning of the Minimum Wage Law.

Count VII is dismissed against Dr. Arunkumar and Ertler but not against Cook County.

## VI. Punitive Damages

Defendants also moved to strike Jensen's prayer for punitive damages against Cook County. *See* Defs.' Mtn. to Dismiss, at 11 (Dckt. No. 29). In response, Jensen withdrew his request for punitive damages against the County. *See* Pl.'s Resp., at 15 (Dckt. No. 33).

The request of punitive damages against the County is dismissed. The dismissal is limited to the County itself. Jensen continues to seek punitive damages against the individual Defendants.

**Conclusion**

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part.

40

Date:  March 5, 2024

_____

Steven C. Seeger
United States District Judge